UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————

ANTHONY ZENO,

<table>
<tr><td></td><td>Plaintiff,</td></tr>
</table>

-against-

PINE PLAINS CENTRAL SCHOOL DISTRICT,

Defendant.

———————————————————————————

**AFFIRMATION OF
JOHN F. MOORE, ESQ.**

07 CIV. 6508 (PED)

**JOHN F. MOORE, ESQ.**, makes this affirmation in support of defendant's post-trial motion pursuant to F.R.C.P. §§50(b), 59(a) and 59(e), and affirms the following, under penalties of perjury:

1.    I am an attorney duly admitted to practice law in the State of New York and before the United States District Court of the Southern District of New York.  I am a member of the law firm of Towne, Ryan & Partners, P.C. attorneys for the defendant, Pine Plains Central School District, with respect to the above-referenced.

2.    I make this affirmation in support of:

    a.    defendant's motion for reconsideration of renewal of defendant's motion for judgment as a matter of law pursuant to F.R.C.P. §50(b);

    b.    defendant's motion pursuant to F.R.C.P. §59(a), for a determination that the jury's award was excessive; and for

        i.    a new trial;

        ii.    new trial limited to damages; or

       iii.     pursuant to the practice of remittitur, condition the denial of the motion for new trial and the plaintiff's acceptance of a reduced amount of damages;

       iv.     defendant's motion to amend the judgment by vacating and/or reducing plaintiff's damages award pursuant to F.R.C.P. §59(e).

3.     Annexed hereto are those exhibits submitted that are relevant to defendant's motion pursuant to F.R.C.P. §59 for remittitur and to amend the judgment on the grounds that the jury's award was excessive, including:

       a.     plaintiff's amended complaint, annexed hereto as Ex. "A";

       b.     plaintiff's initial disclosures and amended initial disclosures annexed hereto collectively as Ex. "B"; and

       c.     plaintiff's amended response to defendant's first set of interrogatories, annexed as Ex. "C".

4.     Attached hereto are the following plaintiff's exhibits admitted into evidence at trial which are cited in the memorandum of law supporting defendant's post-trial motions pursuant to F.R.C.P. §§50(b), 59(a) and 59(e):

       a.     Plf. Ex. "2" – Incident report by John Howe, February 16, 2005;

       b.     Plf. Ex. "4" – E-mail, Kaumeyer to wberard@hoganandwillig.com, April 29, 2005;

       c.     Plf. Ex. "5" – Letter, Zeno(s) to Superintendent, May 13, 2005;

       d.     Plf. Ex. "6" – E-mail from Kaumeyer, re: McGrath Systems Conference Call, June 10, 2005;

       e.     Plf. Ex. "9" – ; Student Referral (Kyle M), September 13, 2005;

f. Plf. Ex. "11" –   Post-incident notes by Howe re: Kyle M incident, September 13, 2005;

g. Plf. Ex. "12A" – Letter, Cathleen Zeno to Kaumeyer, September 19, 2005 with handwritten notes;

h. Plf. Ex. "16" – Order of protection (Kyle M), October 5, 2005;

i. Plf. Ex. "18" – Photograph(s) of bathroom wall, October 26, 2005;

j. Plf. Ex. "24" – Student Referral re: Cory C, S. Jamieson to Cook, January 12, 2006;

k. Plf. Ex. "25" – Student Referral re: Cory C, S. Jamieson to Cook, January 13, 2006;

l. Plf. Ex. "26" –   Memorandum re: Cory C, Cook to Howe, January 13, 2006;

m. Plf. Ex. "38" – Memorandum, Howe to Kaumeyer, January 30, 2006;

n. Plf. Ex. "41" –  McGrath Systems handout, February 2006: "Altering The Culture of Cruelty, A Legally Based Bullying and Harassment Prevention Program";

o. Plf. Ex. "45" – Mediation Appointments, February 22, 2006;

p. Plf. Ex. "50" – Student Referral (Kyle R) March 20, 2006;

q. Plf. Ex. "53" – Letter, Cathleen Zeno to Kaumeyer, October 24, 2006;

r. Plf. Ex. "54" – Handwritten notes (Howe) to Margo;

s. Plf. Ex. "64" –  Letter to Mrs. W., September 27, 2007, with attachments re: Bruce W. 9/14/07 incident;

t. Plf. Ex. "66" – Incident Reports (Neil S) by H. Lamont, January 9, 2008;

u. Plf. Ex. "67" – Student Referral (Neil S) January 15, 2008;

    v.    Plf. Ex. "73" – Anthony Zeno class schedule, Semester 1, 2005, with Howe handwritten notes;

    w.    Plf. Ex. "76" – Handwritten Notes, Howe, 2/3/2006;

    x.    Plf. Ex. "77" – Discipline entry, Kyle R, 3/20/06 re: threatening comments 3/13/06;

    y.    Plf. Ex. "81" – E-mail, Doris Scott to Kaumeyer with attached McGrath Bullying and Harassment materials;

    z.    Plf. Ex. "83" – Student Referral, R.J. H., February 7, 2006;;

    aa.    Plf. Ex. "84" - Letter to parents of R.J. H., February 7, 2006;

5.    Attached hereto are the following defendant's exhibits admitted into evidence at trial which are cited in the memorandum of law supporting defendant's post-trial motion pursuant to F.R.C.P. §§50(b), 59(a) and 59(e):

    a.    Def. Ex. "A" - Pine Plains Central School District Code of Conduct 2004 – 2005;

    b.    Def. Ex. "E" - 9/12/05 letter to Robert M. parents regarding September 12, 2005 incident;

    c.    Def. Ex. "F" - 9/25/05 Student Referral regarding Robert M. social probation;

    d.    Def. Ex. "H" - lunch Monitor 9/21/05 handwritten notes re: 9/12/05 incident between A. Zeno and Robert M.;

    e.    Def. Ex. "K" - December 5, 2005 Howe letter to Jeff M.'s parents;

    f.    Def. Ex. "L" - R.J. H., Stissing Mountain High School discipline report, dated 8/27/07;

    g.    Def. Ex. "O" – Michael M., Stissing Mountain High School Discipline Report 5/3/06;

    h.    Def. Ex. "T" - letter dated October 26, 2006 from Linda Kaumeyer to plaintiff Cathleen Zeno;

    i.    Def. Ex. "W" - James B. Childs/JaRa Consulting LLC proposal for continued diversity initiative – Stissing Mountain High School;

j.      Def. Ex. "X" - Howe memo to Kaumeyer/Throne dated May 16, 2006 re: diversity training proposal;

k.      Def. Ex. "Y" - Memo from Howe to Kaumeyer dated 9/7/06 re: diversity training proposal;

l.      Def. Ex. "Z" - Memo from Howe to Parsons dated September 18, 2007 re: diversity project;

m.      Def. Ex. "CC" - Contract between JaRa Consulting LLC and Stissing Mountain High School;

n.      Def. Ex. "DD" - Notes regarding diversity training administered to staff members and students in connection with Stissing Mountain students and teachers opposed to prejudice (STOP) chapter;

o.      Def. Ex. "EE" - Typewritten notes regarding May 17, 2006 "Surviving in Someone Else's Shoes Day" run by STOP chapter;

p.      Def. Ex. "FF" - Documents related to the Project Wisdom program, a student assembly program administered by Canfel Productions, Inc.;

q.      Def. Ex. "GG" - Documents re: student assembly program conducted by Michael Fowlin;

r.      Def. Ex. "HH" - Cook 2/23/06 notes regarding Jean Cook follow-up with Anthony Zeno;

s.      Def. Ex. "LL" - Signed 2/1/06 letter to Parents re: McGrath training;

t.      Def. Ex. "MM" - Stoorvogel summary re: student Robert M. 2005-2007;

u.      Def. Ex. "NN" - 2/25/05 Student referral – David L.;

v.      Def. Ex. "OO" - 2/21/06 letter to student David L.'s parents dated with 2/16/06 student referral.

6.      In addition, the full trial transcript is submitted herewith. Citations to trial testimony will be labeled as "Tr. _____".

**I.      Trial Evidence Regarding Remedial Measures Taken By Defendant In Response To Known Complaints of Harassment.**

7.      As is set forth in the accompanying memorandum of law, Point II., at trial, exhibits were introduced to the jury and testimony taken which showed that the School District

responded promptly to all known alleged acts of harassment.  Evidence was introduced at trial

that the defendant District complied with the terms of its disciplinary code (Def. Ex. "A", Code

of Conduct, pp. 21-24 and Howe testimony at Tr. 525-30) in responding to each incident at

which it became aware.  What follows is a chart of the evidence introduced at trial regarding

those incidents of harassment made known to defendant, and defendant's remedial

responses/disciplinary actions taken.  Citations will be made to plaintiff's (Plf. Ex. ____) or

defendant's (Def. Ex. ____) exhibits introduced at trial or, where applicable, trial testimony

regarding this, in chronological order:

| | |
|---|---|
| 2/16/05: | An incident occurring involving student Michael O. in the gym. The undisputed evidence indicates that Principal Howe spoke with both Anthony and Michael O., spoke with both student's parents, warned Michael O., and no further incidents ever occurred involving Michael O.  (Plf. Ex. "2"; Tr. 65, 152-53, 397-400, 530-31). |
| 2/25/05: | Student David L. was involved in a scuffle with Anthony in the school hallway in which Anthony's necklace was broken. Anthony testified that David referred to this necklace as a piece of "fake rapper bling bling" and admitted during cross-examination that this was done outside of the hearing of the Principal.  It is undisputed that David L. was given five days suspension for the incident, and disciplinary records indicate that he was ordered to pay for the necklace.  (Def. Ex. "NN"; Tr. 105-06, 153-55, 403-404, 531-32). |
| 5/13/05 | The Zeno parents authored a letter to the School Superintendent referencing the fact that their children "had been victims of verbal, racial attacks and physical abuse from some of the students."  (Plf. Ex. "5").  The majority of this letter concerned another Zeno child, J.Z., and no specific incidents were reported in the letter regarding plaintiff Anthony.  During trial Mrs. Zeno testified that the "verbal racial attacks and physical abuse" she was referring to as it pertained to Anthony in this letter was the February 2005 incident involving Michael O.  (See, Id., Tr. 67-68, 276, 620). |
| Spring 2005: | Trial testimony indicated that no other reported acts of harassment occurred during Spring 2005.  (Tr. 156, 204, 410, 532-3). |

9/12/05:    Trial testimony and exhibits introduced indicate that an incident occurred with student Robert M. on this date.  Robert attempted to punch Anthony and did not injure him.  No racial language was reported to the School District, nor did the Principal's investigation reveal evidence of any racial incident.  Student Robert M., who made threatening actions towards Anthony and referred to him as a "stupid fucking idiot", was suspended for 5 days and placed upon social probation, which prevented Robert M. from returning to the football team with Anthony.  No further incidents ever occurred between Robert M. and Anthony on campus.  (Plf. Ex. "8", Defendant's Exs. "E" – "F", "H"; "MM"; Tr. 72, 157-59, 220, 279-87, 313, 345-349, 412-414, 430).

9/13/05:    Trial testimony and exhibits were introduced which indicated that an incident occurred in the School cafeteria between student Kyle M. and Anthony.  Evidence indicated that Kyle M. used profanity, threatened Anthony with a chair and the students "bumped chests" and used foul language against one another.  The admissible evidence indicates that no report of racial language was made known to the School District.  The School District responded by suspending student Kyle M. for five days and putting him on social probation, and following this no further incidents were reported between plaintiff and Kyle M.  In addition, due to comments that Kyle M. made when the Principal was speaking to him, the School District reported the incident to the police, and the police went to Kyle M.'s house.  Also, the police instituted an order of protection against Kyle M. and plaintiff admitted at trial that Kyle M. was never in class with him thereafter.  (Plf. Ex. "9", "11", "16"; Def. Exs. "H"; Tr. 73 160-1, 279-81, 418-425, 430, 537-543).

10/26/05    Testimony and exhibits indicate that graffiti was found on the boy's bathroom wall within the School which stated: "Zeno is dead", and "Zeno will die, Yup", but no racial language.  The School Principal took photos of this graffiti, the matter was reported to the police, and the school's dean of students conducted a handwriting analysis, although the School was not able to find the responsible student(s).  (Plf. Ex. "18", "72"; Tr. 164, 435-36, 545-47).

11/2005    Trial Testimony indicated that at this time, Principal Howe spoke with Anthony's teachers, teacher aides, guidance counselors, lunch monitors, the football coach, school hall monitors, cafeteria workers and told them all to watch him.  Plaintiff's Ex. "73", which is Mr. Howe's notes regarding these meetings, did show that there may have been racial comments in Mrs. Jamieson's art class, and he instructed the teacher to report any future incidents and the

names of responsible students, which she did. (Plf. Ex. "73"; Tr. 401-3, 439-40, 448-451, 543-44, 547-49, 621, 643-44).

12/5/2005
Student Jeff M. is disciplined for distributing an offensive homemade CD. This CD had language about race, religion and sex that was considered by School District officials to be offensive, but trial testimony indicated that this CD did not name plaintiff in any way. However, Jeff M. was suspended and given social probation, and no further incidents occurred involving student Jeff M. and Anthony that were reported to the School District. (See, Def. Ex. "K"; Tr. 114-116, 165-66, 451-454, 549-551).

1/2006
Art Teacher, Mrs. Jamieson, who had been told by Mr. Howe to report incidents in her class, reported on or about January 12-13, according to trial testimony and exhibits, that student Corey C. had been using inappropriate racial language in her class. Corey was suspended for 5 days. When he returned to school on or about January 25, 2006, it was undisputed that he confronted plaintiff and blamed him for the suspension. However, no racial language was reported on this incident, Corey was suspended for 5 days again, and no further incidents occurred involving this student. (See, Plf. Exs. "24" – "26"; Tr. 166-69, 456, 551-54).

2/3/2006
Principal Howe had been summoned to Ms. Jamieson's class by the teacher. An incident had occurred in the hallway with student R.J. H., when plaintiff pointed out R.J. to the Principal and the boys argued, but no racial language was used, and the boys were separated. The trial evidence did not indicate any other on-campus incidents between R.J. and Anthony. (See, Plf. Ex. "76"; Tr. 481-485, 554-55).

2/7/06
In an incident which trial testimony and exhibits indicate that did not involve plaintiff Anthony, student R.J. H. was heard by staff using racial language after coming out of a school assembly (which racial language/incident did not specifically concern or involve Anthony), and R.J. was suspended. Following this incident, no further incidents were reported involving R.J., who was no longer a student at the school as of October 2006. (Plf. Exs. "83", "84"; Def. Ex. "L"; Tr. 475-78, 556-60).

2/16/06
On this date, plaintiff Anthony opened his hall locker, and the door, which had been unscrewed, fell off. The School District's investigation revealed that two students, Michael M. and David L. were responsible for unscrewing the locker door, were each suspended and after these suspensions no further incidents

occurred involving either student.  (See, Def. Exs. "O", "OO"; Tr. 171, 487-491, 560-62).[1]

3/17/06  The previous weekend, a van had appeared at the Zeno home and the inhabitants had made what Anthony perceived as threatening actions to him.  The police had reported this incident to Principal Howe on March 17, 2006, and on the same day Howe saw a van fitting that description on campus, and immediately contacted the police, put the school on lockdown, and kept the school on "Code Yellow" until the police located the van, which plaintiff's mother testified was an appropriate response to the incident.  No current Pine Plains students were identified in the van, nor was that van seen on campus again.  (Tr. 79, 128-130, 172-73, 497-501, 570-71).

3/20/06  Student Kyle R. makes an offensive racial statement in Mrs. Jamieson's art class, which statement was reported by the art teacher.  Kyle R. was suspended for 5 days and no further incident occurred involving this student.  (Plf. Ex. "50", "77"; Tr. 73-74, 171-72, 491-494, 496, 571-572).

Post-Spring 2006:  The record is notable for the lack of reported, verified incidents after this.  Testimony indicated that Mr. Howe told Anthony to report to him anything that occurred.  Plaintiff admitted that he testified thusly at deposition, and also admitted that Jean Cook, who was Dean of Students in the 05-06 school year, told him the same thing, which is also evidenced in Ms. Cook's memorandums of January 13, 2006 (Plf. Ex. "26"), and February 23, 2006 (Def. Ex. "HH").  Plaintiff testified that he did not like Ms. Cook, who he said smelled like cigarettes, so he did not report anything to her.  (Tr. 144-5.)  Mr. Howe testified that he also encouraged Anthony to report any incidents to him, the Dean of Students, the Football Coach, or anyone else he felt comfortable with reporting to, the trial testimony indicates that Anthony made no further reports of incidents occurring in Spring 2006.  (Tr. 173-74, 262-63, 573, 579-81, 611-612).

Fall 2006:  The record evidence indicates that no further incidents occurred, other than Anthony's football locker being urinated in by another football player, who the School District's investigation indicated was an African American student, that this was not a racially motivated incident, and that that student was disciplined by being expelled.  (See, Plf. Ex. "53", "54"; Def. Ex. "T"; Tr. 573-76).

---

[1]  It should be noted that, other than student Corey C. confronting plaintiff about his suspension in January 2006, the incident involving David L. unscrewing Anthony's locker was the only "repeat incident" involving any individual student (David L. had been previously disciplined for breaking Anthony's necklace, although there was no racial indicia to either the necklace or the February 2006 locker incidents).

Fall 2007:   It is undisputed that the only reported incident involving Anthony during this semester occurred at a football game on September 14, 2007, when student Bruce W. started a fight with and choked one of Anthony's friends, and according to plaintiff said he would "kick my black ass.".  Bruce W. was suspended, and after a Superintendent's hearing was expelled for 45 days.  Plaintiff had never reported Bruce prior to his and no further incidents occurred involving Bruce W.  (Plf. Ex. "64"; Tr. 175-76, 576-78).

1/9/08:   It was reported, by a classroom hall monitor, that plaintiff Anthony was observed having words with student Neil S., following investigation it came to the School District's attention that Neil S. had made a racial comment on the BOCES bus.  Testimony of Principal Howe, Dean of Students Richard Starzyk and trial exhibits indicated that Starzyk spoke with Neil's mother, suspended Neil for a half day and no further incidents occurred involving Neil.  (Plf. Exs. "66", "67"; Tr. 176-77, 519-520, 578-79, 644-652).

## II.   Trial Evidence Regarding The School District's Proactive, Preventative Measures.

8.   The record evidence provided at trial indicates that discipline of students is not the only action taken by the School District in response to the incidents that occurred with the plaintiff.   Trial evidence established that in addition to discipline, the following proactive measures were taken by the School District:

    **a.**   **McGrath Systems:**  Record evidence indicates that the School Superintendent reached out to McGrath Systems trainer regarding an anti-bullying seminar being brought to the School District, with the original target date of Fall 2005.  Due to scheduling difficulties, McGrath was brought in February 2006, and presented a three day seminar that involved components of student training, staff training, and an evening session for parents and members of the community.  Testimony indicated that while this training seminar focused on bullying and harassment prevention, including other issues such as sexual harassment, the McGrath training including component on racial harassment.  (See, Plf. Exs. "4", "6", "41", "81"; Tr. 204-209, 250-255, 281-5, 295, 300-01, 472-74, 568-570; Def. Ex. "LL")).

    **b.**   **James Childs/JaRa Consulting:**  The evidence at trial showed that in January 2006, Principal Howe had recommended James Childs of JaRa Consulting to Superintendent Kaumeyer.  (Plf. Ex. "38").  Memorandums marked as exhibits indicated that the School District negotiated with Mr. Childs during Spring 2006 (see, Def. Ex. "X") and that as of the Fall 2006 semester, Mr. Childs was brought in to conduct focus

groups, administered surveys, and his work at the District continued into the 2007-2008 school year which included staff training.  (See, Plf. Ex. "58"; Def. Exs. "W", "X", "Y", "Z", "CC"; Tr. 263-265, 278-79, 286-7, 301, 505-07, 509-517, 586-92, 617-18, 653-54).

c.      **Camfel Productions**:  Testimony of Principal Howe indicated that the District brought in Camfel Productions to present a seminar on bullying, prejudice and decision-making, which program included a racial harassment aspect during the two school years including 2006-2007 school year. (See, Def. Ex. "FF", last page; Tr. 599-600).

d.      **S.T.O.P. (Students and Teachers Opposed to Prejudice)**:  A student-teacher group called STOP, Students and Teachers Opposed to Prejudice, was reorganized and revitalized in 2006-2007 according to trial testimony and documents introduced at trial. Plaintiff Anthony was a member, and the group attended a diversity conference in New Paltz, worked with Mr. Childs of JaRa Consulting, helped organize a "Surviving In Someone Else's Shoes Day" in May 2007, and brought a "rap artist" to campus (during which presentation plaintiff Anthony was brought up on stage with that rapper and was cheered by the student body).  (See, Def. Ex. "DD", "EE"; Tr. 177-79, 271, 287-9, 295, 301, 434-35, 654-55, 593-96).

e.      **Project Wisdom**:  According to trial testimony and documentary evidence, Project Wisdom, a character education program that involved positive, values-oriented messages read over the public address system in the mornings, was introduced during plaintiff's senior year, and these announcements included racial harassment prevention as part of the program. (See, Def. Ex. "FF"; Tr. 291-95, 302, 596-99, 655-56).

f.      **Michael Fowlin**:  Trial testimony also showed that the School District brought in a one man show/student assembly by Michael Fowlin, which one man show dealt with issues of race, discrimination, violence prevention, personal identity, suicide, gender equity, homophobia, and the emotional pain felt by special education children. (See, Def. Ex. "GG"; Tr. 584-86).

g.      **Mediations**:  Trial testimony and exhibits also showed that as of January 2006, the Principal had communicated to the Superintendent that mediations were looked into and improved issues of school climate and culture, including plaintiff's issues.  (See, Plf. Ex. "38").  According to testimony presented at trial, mediations were scheduled for February 22, 2006, mediations were scheduled involving the parents and students with whom plaintiff had issues with on campus.  According to testimony and documentary evidence, these students and families were willing to participate in the mediation. However, plaintiff's mother, Cathleen Zeno (who testified that mediation would have been a proactive approach to handling problems in school) declined to participate, thus the mediations did not go forward.  (Plf. Ex. "45"; Tr. 562-68, 45, 77-78, 85, 277, 468).

III.    **Evidence Regarding Plaintiff's Damages Claim.**

9.      Plaintiff's "prayer for relief" in his amended complaint requested that the Court "award the plaintiff compensatory damages to compensate him for the physical and emotional damages he sustained as a result of defendant's failure to provide for an educational environment free from racial discrimination." (Ex. "A", Amended Complaint, p. 6, **"PRAYER FOR RELIEF"**).

10.     Plaintiff's Rule 26 initial disclosure provides the following "computation of damages": "The amount compensable for assault, battery, emotional distress, pain and mental anguish shall be left to the determination of the jury on the basis of the evidence presented at trial." (Ex. "B", plaintiff's initial disclosures, ¶3). Plaintiff's amended initial disclosures (also submitted as part of Ex. "B"), does not change this damages computation.

11.     Plaintiff's amended response to defendant's first set for interrogatories claims that "plaintiff's claim for an amount compensable for emotional distress, pain, suffering, and mental anguish shall be left to the determination of a jury on the basis of evidence presented at trial…". (Ex. "C", plaintiff amended interrogatory response, ¶13, p. 20).

12.     Finally, and critically, the Court's instructions to the jury regarding damages was as follows:

> "If you find in favor of the plaintiff, then you must award him such sum of money as you believe will fairly and justly compensate him for any injury you find he actually sustained as a consequence of defendant's conduct.
>
> When considering the amount of monetary damages to which the plaintiff may be entitled, you should consider the nature, character, and seriousness of any pain or suffering, mental anguish, humiliation or loss of enjoyment of life Plaintiff experienced. You must also consider its extent or duration, as any award you make must cover the damages endured by Plaintiff since the wrongdoing to the present time, and even into the future if you find as fact that the proofs presented justify the conclusion that Plaintiff's emotional stress and its consequences have

continued to the present time or can reasonably be expected to continue in the future.

> Where mental or emotion distress is proved, the Court cannot give you any rule by which to measure the specific amount of damages resulting from such an injury. This matter is left to your conscience, good sense and sound judgment. You should not act unreasonably through bias, passion, or sympathy and should instead exercise common sense and fix an amount of damages that, in accordance with the evidence and the law, will fairly compensate the plaintiff for all of the injuries, if any, you determined were suffered." (Tr. 731-732).

13.     It is clear from plaintiff's pleadings as well as the instruction given to the jury that any award given to the plaintiff in this litigation was entirely for emotional damages, including pain and suffering, mental anguish, humiliation, or loss of enjoyment of life. As is set forth in the accompanying memorandum of law, Point III, plaintiff's emotional distress claim should be reduced significantly as emotional distress damages in a civil rights cases depend upon the nature of the evidence produced. In this case, the evidence produced by the plaintiff in support of his compensatory/emotional damages claim, was, to say the least, negligible. In construing the trial testimony as a whole, the entirety of plaintiff's case regarding his emotional damages was the testimony of his mother, and his own testimony.

14.     Anthony's mother, Cathleen Zeno, described him as follows: "he's so upbeat, so outgoing, so friendly, so positive", but that when he began going to Pine Plains School District, he became more emotional, more guarded, more suspicious, and more "explosive", on one occasion grabbing and slamming down a dining room chair because, according to Mrs. Zeno, he was "frustrated and angry." (Tr. 61-62). However, Mrs. Zeno testified that she saw an improvement in Anthony "during his last year when he started going to BOCES." (Id., pp. 62-63). Mrs. Zeno admitted that Anthony saw a mental-health professional only "on and off" for a year. (Id., p. 63).

15.     Plaintiff himself also testified, very briefly, under direct examination and under cross-examination, regarding his emotional damages.  Plaintiff's testimony regarding his mental health treatment for emotional damages on direct examination constituted less than one page of the trial transcript, which testimony also included his testimony regarding his future plans:

"Q.     Did you treat with any mental health professionals during the time you were at the high school?

A.     They sent me to a therapist.

Q.     And how long did you go?

A.     I went there for a while, but then it stopped because she left.  And then I continued with another woman, but that didn't last.

Q.     Why didn't it last?  Do you know?

A.     Because she classified me as – that, because of what things that I told them was happening to me, she thought that I could be a danger to myself.

Q.     That's what she told you?

A.     Yeah.

Q.     So what are you doing with yourself now, Anthony?

A.     I go to school.

Q.     Where?

A.     In Ulster County.

Q.     Doing what?

A.     I cut hair.

Q.     You're leaning how to cut hair?

A.     Yes.

Q.     That's what you want to do?

A.     No.  It's just a – actually, a notch I want to add on my belt.  I want to – well, I used to attend college for business, and I was pursuing law enforcement.  And that's what I want to be heading back to.  I want to be a cop." (Tr. 146-47).

14

16.     Later, on cross, the plaintiff briefly testified as to counseling he received for his

purported emotional damages:

> "Q.     Now, you talked about counseling that you went to while you were at
> school.
>
> A.      Yes.
>
> Q.      Was that with Family Services?
>
> A.      Yes.  In Poughkeepsie.
>
> Q.      The Crime Victims Unit?
>
> A.      Yes.
>
> Q.      And was the name of the therapist Maria Ann?
>
> A.      Yes.
>
> Q.      And did you go see her four times during 2006 and 2007?
>
> A.      Yes.  I think more than that, though.
>
> Q.      Okay.  If I have records that show that you went four times, would I be
> wrong?
>
> A.      Well, you have the records, so, yeah.
>
> Q.      Just asking you for your recollection.
>
> A.      Yes.
>
> Q.      And did you go back to Family Services ever again after Maria left?
>
> A.      Yes.  I saw some other lady.  I don't know her name.
>
> Q.      Okay.  Did you not like her?
>
> A.      Yes.  I didn't like her at all.
>
> Q.      Okay.  Did you ever go to any other therapy, other than Family Services?
>
> A.      No, because I didn't want to go back there."  (Tr. 179-80).

17.     Other than the aforementioned testimony of Cathleen and Anthony Zeno, the only

testimony that could be described as concerning his emotional damages was the testimony of

Eloise Maxey of the NAACP who testified that "when I first met with Anthony Zeno, I saw a very terrified, pathetic and sad young boy." (Tr. 388-89).

18.     The gravamen of this testimony indicates that plaintiff admitted at trial that he treated at most for less than a year with the Dutchess County Crime Victims Unit.  He treated for approximately four treatments with therapist Maria Ann and when a new therapist was assigned, he did not like her and did not go back.  Critically, absolutely no medical expert testimony, nor the testimony of any of these therapists was brought in.  The therapy records were not introduced as exhibits or given to the jury.  Plaintiff testified to no ongoing physical or mental limitations or problems resulting from defendant's actions.  Construed liberally, less than 7 pages of the 745 page trial transcript concerns the plaintiff's testimony regarding his damages, emotional or otherwise.  As is set forth in the accompanying memorandum of law, Point III., courts have found that compensatory/emotional damages awards, in cases where evidence is presented similar to that presented in this case, constitutes a "garden variety" emotional distress claim, and damages should be reduced significantly from the astronomical $1.25 million awarded in this case.

19.     For the reasons set forth in the accompanying memorandum of law, it is respectfully submitted that defendant's post-trial motions be granted.

TOWNE, RYAN & PARTNERS, P.C.
Attorneys for Defendant
John F. Moore, Esq.
Bar Roll No.:  JM1016
*Office and P.O. Address*:
450 New Karner Road, P.O. Box 15072
Albany, New York  12212
Tel. No.:  (518) 452-1800

TO:    BERGSTEIN & ULLRICH, LLP
        Attorney for Plaintiffs
        Stephen Bergstein, Esq.
        *Office and P.O. Address*:
        15 Railroad Avenue
        Chester, New York 10918
        Tel. No.: (845) 469-1277

193.7141/Post-Trial/Affirm JFM